UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RUDOLPH JAMES ROCK,

        Petitioner,

vs.                                    Case No. 3:03-cv-719-J-20MMH

JAMES CROSBY, etc.; et al.,

        Respondents.

_____

## ORDER

### I. Status

Petitioner, an inmate of the Florida penal system who is proceeding pro se, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to 28 U.S.C. § 2254 on August 25, 2003. He challenges his March 6, 2000, state court (Duval County) conviction for dealing in stolen property on the following grounds: (1) the trial court erred in instructing the jury on the principal theory; (2) the trial court committed fundamental error in instructing the jury that possession of recently stolen property gives rise to an inference that the Petitioner knew the property was stolen; (3) the trial court erred in using a case in which the prosecution had entered a nolle prosequi in calculating his sentence under the guidelines; (4) Petitioner's appellate counsel was ineffective for failing to argue that the trial court was biased against Petitioner; and, (5)

Petitioner's appellate counsel was ineffective for failing to argue that the prosecutor, in closing argument, violated the "Golden Rule."[1]   Petition at 9A.

On November 6, 2003, Respondents filed an Answer to Petition for Writ of Habeas Corpus (Doc. #7) (hereinafter Response). Petitioner's Traverse Response to State's Answer to Petition for Writ of Habeas Corpus (Doc. #9) was filed on December 1, 2003.  On September 9, 2004, Petitioner filed supplemental authority in support of ground three of his Petition.  See Supplement Petition of Habeas Corpus (Doc. #14).  This case is now ripe for review.

## II. Procedural History

On February 15, 2000, after a trial by jury, Petitioner was found guilty of one count of dealing in stolen property.  Ex.[2] C at 329.  On March 6, 2000, the trial court adjudicated Petitioner guilty and sentenced him as a habitual felony offender to a term of twenty-three years of imprisonment.  Ex. B.

On direct appeal, Petitioner's appellate attorney raised the following two issues:

---

[1] "A 'golden rule' argument asks the jurors to place themselves in the victim's position, asks the jurors to imagine the victim's pain and terror or imagine how they would feel if the victim were a relative." Hutchinson v. State, 882 So.2d 943, 954 (Fla. 2004) (per curiam) (citing Pagan v. State, 830 So.2d 792, 812-13 (Fla. 2002)).

[2] The Court hereinafter refers to the exhibits submitted with the Response as "Ex."

2

ISSUE I

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY
ON THE PRINCIPAL THEORY, LEADING TO AN
UNRELIABLE VERDICT.

ISSUE II

THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR IN
INSTRUCTING THE JURY THAT POSSESSION OF
RECENTLY STOLEN PROPERTY GIVES RISE TO AN
INFERENCE THAT THE PERSON IN POSSESSION KNEW
THE PROPERTY WAS STOLEN.

Ex. E at i.

On February 9, 2001, the First District Court of Appeal per
curiam affirmed the judgment of conviction, without issuing a
written opinion. Ex. H at 1. The mandate issued on February 27,
2001. Id. at 2.

On December 6, 2001, Petitioner filed a Motion for Post
Conviction Relief pursuant to Fla. R. Crim. P. 3.850, raising eight
grounds pertaining to trial and sentencing errors. Ex. I. On
January 30, 2002, the trial court entered an Order Denying
Defendant's Motion for Post Conviction Relief, finding that the
claims were procedurally barred because they should have been
raised on direct appeal. Ex. J. Petitioner appealed, and on July
24, 2002, the First District Court of Appeal per curiam affirmed
the trial court's order, without issuing a written opinion. Ex. K;
Ex. L at 1. The mandate issued on August 20, 2002. Ex. L at 2.

On September 24, 2002, Petitioner filed a Motion to Correct
Illegal Sentence. Ex. M. The trial court denied the motion on

3

February 19, 2003.  Ex. N.  Petitioner appealed, and on July 14, 2003, the First District Court of Appeal per curiam affirmed the trial court's order, without issuing a written opinion.  Ex. O; Ex. P at 1.  The mandate issued on September 4, 2003.  Ex. P at 2.

On or about January 29, 2003, Petitioner filed Petition for Writ of Habeas Corpus in the First District Court of Appeal, raising two ineffective assistance of appellate counsel claims. Ex. Q.  The court summarily denied the petition on February 26, 2003.  Ex. R.

As noted previously, Petitioner filed the Petition before this Court on August 25, 2003.  Thus, Respondents assert, and this Court agrees, that this action was timely filed within the one-year limitation period for filing Section 2254 petitions.  See 28 U.S.C. § 2244(d)(1); Response at 6-7.

### III.  Evidentiary Hearing

The Court has carefully reviewed the record and, for the reasons set forth more fully below, concludes Petitioner is not entitled to an evidentiary hearing.  Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999).  The pertinent facts of the case are fully developed in the record before the Court.  Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992).  No additional evidentiary proceedings are required.  High v. Head, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)), cert. denied, 532 U.S. 909 (2001).

4

## IV.   Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corrections, 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).

The Supreme Court has explained:

> The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law.  See Williams v. Taylor, 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  To these ends, § 2254(d)(1) provides:

>> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

>> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

5

> determined by the Supreme Court of
> the United States."

Bell v. Cone, 535 U.S. 685, 693-94 (2002).

Clearly, the new 28 U.S.C. § 2254(d) creates a more deferential standard for federal court review of state court adjudications: "[u]nless a state court decision is directly contrary to Supreme Court case law, we review state court findings of fact and conclusions of law for reasonableness." Van Poyck v. Florida Dep't of Corrections, 290 F.3d 1318, 1321 (11th Cir. 2002) (per curiam), cert. denied, 537 U.S. 812 (2002), 537 U.S. 1105 (2003); Mitchell v. Esparza, 540 U.S. 12 (2003) (per curiam) (holding that the Ohio Court of Appeals' decision was not "contrary to" or an "unreasonable application" of clearly established federal law and stressing "the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)").

The "contrary to" and "unreasonable application" clauses have independent meaning and provide separate bases for federal habeas review:

> "Under the 'contrary to' clause, a
> federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite
> to that reached by this Court on a question of
> law or if the state court decides a case
> differently than this Court has on a set of
> materially indistinguishable facts."
> Williams, 529 U.S. at 412-13, 120 S.Ct. at
> 1523 (O'Connor, J., concurring). The
> "contrary to" clause "suggests that the state
> court's decision must be substantially
> different" from the controlling legal
> precedent. Fugate v. Head, 261 F.3d 1206,

1216 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, --- U.S.
---, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002)
(quoting <u>Williams</u>, 529 U.S. at 405, 120 S.Ct.
at 1519).    A state court's decision that
applies the correct legal rule would not fit
within the "contrary to" clause even if the
federal court might have reached a different
result relying on the same law.  <u>See</u> <u>Williams</u>,
529 U.S. at 404-06, 120 S.Ct. at 1519-20
(O'Connor, J., concurring).

    . . . .

"Under the 'unreasonable application' clause,
a federal habeas court may grant the writ if
the  state  court  identifies  the  correct
governing legal principle from this Court's
decisions  but  unreasonably  applies  that
principle to the facts of the prisoner's
case."  <u>Williams</u>, 529 U.S. at 414, 120 S.Ct.
at  1523  (O'Connor,  J.,  concurring).    In
deciding this issue, the federal court should
consider whether the state court's application
of the law was objectively unreasonable and
should  not  apply  the  subjective  "all
reasonable jurists" standard.  <u>Id</u>. at 409-10,
120  S.Ct.  at  1521-22.    The  Supreme  Court
recently  adhered  to  its  pronouncements  in
<u>Williams</u>,  stating  that  "we  stressed  in
<u>Williams</u> that an unreasonable application is
different  from  an  incorrect  one."    <u>Bell  v.</u>
<u>Cone</u>, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152
L.Ed.2d 914 (2002).  The Court further noted
that "a federal habeas court may not issue a
writ under the unreasonable application clause
'simply because that court concludes in its
independent judgment that the relevant state-
court decision applied clearly established
federal law erroneously or incorrectly.'" <u>Id</u>.
(quoting <u>Williams</u>, 529 U.S. at 411, 120 S.Ct.
at 1522 (O'Connor, J., concurring)).

<u>Wellington v. Moore</u>, 314 F.3d 1256, 1260-61 (11th Cir. 2002).

    The Eleventh Circuit has addressed the application of the
"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of AEDPA, we have recognized that where no Supreme Court precedent is on point, "we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court." <u>McIntyre v. Williams</u>, 216 F.3d 1254, 1258 (11th Cir. 2000).

<u>Washington v. Crosby</u>, 324 F.3d 1263, 1265 (11th Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine whether the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, AEDPA "also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. <u>See</u> <u>id</u>. at § 2254(e)(1).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. <u>Wright v. Secretary for the Dep't of Corrections</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert.</u> <u>denied</u>, 538 U.S. 906 (2003). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

8

## V. The Evidence Presented at Trial

In Petitioner's initial brief on direct appeal, the appellate attorney thoroughly summarized the evidence presented at trial as follows:

> Michael Baker testified that he was the owner of Showplace Lawns, a lawn maintenance company (III-112)[3]. On the morning of July 22, 1999, he and several associates drove to the Church of God on Soutel Drive to do lawn maintenance (III-113). When they arrived, they parked their truck, which Baker described as "a small delivery truck," in the parking lot behind the building. All of the lawn equipment and tools were kept in the "enclosed box" on the back of the truck (III-113-114).
>
> At about 8:15, while Baker was mowing the church property, he noticed several cars pulling into the church parking lot and turning around to avoid waiting for a freight train that was passing by (III-116-117). A blue car pulled in and instead of turning around it went toward the back. At first, Baker was not concerned because he thought his partner was back there (III-117), but Baker became alarmed when the blue car did not do "a simple turn around." Then Baker saw the car come back out and head east on Soutel Drive. He could see the end of an edger sticking out of the front passenger window. A black male was driving the car, which Baker described as blue with a "white or silver panel down the bottom third of the doors." Baker testified that he saw only the one person in the car, the black male[4] who was driving (III-118-119).

---

[3] The citation to "III" refers to the trial transcript, which has been provided to this Court as Ex. C.

[4] Petitioner is caucasian.

Baker immediately went to the rear parking lot to see if his partner was okay and to check the truck. He noticed that an edger and a "back-pack blower" were missing (III-119). Baker identified State's Exhibit's [sic] A and B as the edger and blower, the property of Showplace Lawns, that was taken from his truck on July 22, 1999; those items were admitted into evidence and published to the jury (III-126-127).

On cross-examination, Baker stated that from where he had been standing there were no obstructions when the car came toward him with the edger sticking out of the passenger window (III-131-132), and again testified that he had only seen one person, a black male, in the car (III-133). Baker also testified that only one police officer had responded to the call that day, Officer Freeman. No evidence technician came, and the truck was never dusted for fingerprints (III-134).

On re-direct, Baker testified that the truck has a hydraulic ramp in the back, and that it was possible for someone to step into the truck and take items out without touching any other part of the truck (III-135); later on re-cross, Baker testified that when he gets into the truck without using the ramp he grabs onto the side of the van (III-137). Baker was again asked if it was possible that there had been other people in the car that he saw drive away with his edger in it. His response was "I suppose anything is possible. I didn't see one" (III-136).

Andricka Joseph testified that she was working at Value Pawn on July 22, 1999 (III-139-140). She identified State's Exhibit C as the receipt slip from a transaction she conducted on that date (III-143-145). The slip indicated the time of the transaction as 9:00 a.m., and that Rudolph J. Rock was the person who conducted that transaction. Mr. Rock's driver's license number was on the form, and his thumbprint was in the lower right-hand corner (III-145). Mr. Rock pawned

an edger and a blower and received two hundred dollars (III-146-147).

On cross-examination, Ms. Andricka testified that the amount paid to a customer for pawned items depends on how much the customer needs or asks for, and that it was her manager's decision to pay a hundred dollars for each of these items (III-149-150). She admitted that everyone who pawns something has to provide a driver's license, a signature and a thumbprint, but that she did not remember Rudolph Rock doing those things (III-150). She said she didn't have a recollection of his face and that there was nothing about this transaction which stood out in her mind at all (III-150-151).

Gary Peacock, a detective in the burglary division of the Jacksonville Sheriff's Office, testified that he interviewed Rudolph Rock on August 27, 1999 (III-152-153). Prior to the interview, the detective familiarized himself with the July 22nd transaction involving the two pieces of lawn equipment taken from Showplace Lawns, and he had computer print-outs from the pawn shop with Mr. Rock's name on them (III-154-155). Peacock stated that on the day of the interview, Mr. Rock's physical condition was "dirty and tired," and that he was a little sleepy, but he appeared to know what was happening (III-156). Peacock read Mr. Rock his constitutional rights. Detective Valentine was also present and signed the form indicating that he had witnessed Mr. Rock being advised of his rights (III-156-157). After Mr. Rock indicated that he understood his rights and did not request a lawyer, Peacock questioned him about the transaction at Value Pawn on July 22, 1999 (III-160-161). According to Peacock, Mr. Rock said that he pawned the property and admitted that he had taken it (III-162).

On cross-examination, Detective Peacock stated that Detective Valentine had asked him to assist him with the interview of Mr. Rock, which lasted about two hours. Mr. Rock

appeared tired and sleepy so Detective Valentine had gotten him some coffee to wake him up (III-163-164). Peacock testified that "to his recollection" he never left the interview room and returned to find Mr. Rock asleep (III-165). At one point another detective, Detective Bolena came into the interview room and talked with Mr. Rock. No part of the interview was audiotaped or videotaped (III-168-169).

James Valentine, a detective with the Jacksonville Sheriff's Office (III-171), testified that Mr. Rock appeared tired when Detective Peacock read him his rights, and during the interview, but that he appeared to "know what was happening." Valentine witnessed Mr. Rock sign the rights form and heard him respond that he understood those rights (III-172-173); Mr. Rock did not request a lawyer (III-174). Detective Valentine then asked Mr. Rock about pawning or selling some property at Value Pawn on July 22nd. Valentine testified that Mr. Rock told him "another person had stolen the items off of a truck," and "that he witnessed that person take the items." Rock said he took the items and pawned them because he had identification and the other person didn't (III-175). Valentine testified that at some point later in the interview, Mr. Rock said he had taken the items off of the truck and pawned them (III-175-176).

On cross-examination, Valentine stated that Mr. Rock did not fall asleep while he was (detective) was [sic] in the room. However, he testified that when he left the interview room, Mr. Rock was asleep "at times" when he and Detective Peacock returned, and he admitted that Mr. Rock nodded off several times while both Valentine and Peacock were in the room with him (III-177-178). Valentine testified that he wrote out the arrest narrative for Detective Peacock, and also filled out the affidavit and signed it for Peacock, who was the arresting officer in the case (III-180).

12

Michelle Royal, a latent print examiner with the Jacksonville Sheriff's Office (III-195), testified that she compared the thumbprint on the pawn slip to prints she obtained from Rudolph Rock and concluded that the print on the pawn slip was made by the right thumbprint of Rudolph Rock (III-200-201, 204). At this point the state rested (III-204).

Defense counsel moved for judgment of acquittal on grounds that the state had not made a prima facie case against Mr. Rock because the victim, Mr. Baker, did not identify Mr. Rock and stated that he had only seen one man, a black male, in the car that drove off with one of the stolen items, and because one of the alleged confessions was inconsistent with what the victim said; the motion was denied (III-204-205).

Michael Allen Dean testified for the defense, and admitted that he had four prior felony convictions, and twelve convictions for crimes of dishonesty (III-212-213). Mr. Dean testified that he and Rudy, Rudolph Rock, were having breakfast at the McDonald's on University Avenue, near the Arlington Expressway. Rudy finished first and went outside to his car. Dean was still inside eating when he saw two black guys approach Rudy in a "blue or gray Chevy Corsica" (III-213-214). Dean did not know either of the two men. When Dean had finished eating he went outside where the men who had pulled up in the blue car had "an edger and a blower sitting on the ground showing Rudy" (III-215). They were trying to sell them to Rudy for $30.00 a piece, and Rudy told them to "fire up" the lawn equipment to see if it worked. Mr. Dean identified the items in State's Exhibit 2 as the edger and blower that the black male offered to sell to Mr. Rock (III-215-216). Dean testified that the man said he had to sell them to pay a DUI fine, and that he had to be in court that morning. Dean testified that there was nothing that would have led him to believe the items were stolen. The black

13

male and Mr. Rock agreed on a price of $60.00 for both pieces (III-216-217). Rock purchased the two items and put them in Dean's car. Dean then drove Rock to Value Pawn on Atlantic Boulevard, where he sold them for $200.00; Dean witnessed the transaction. When they left the pawn shop, Dean dropped Mr. Rock off at Justina Apartments, and Rock gave him $5.00 of the money for gas (III-218-219). After a proffer by the defense, Mr. Dean was asked if, when he was with the black male and Mr. Rock outside the restaurant, he had heard the black male say anything that might have led him to believe the items were stolen. His response was, "No, sir" (III-230).

On cross-examination, Mr. Dean was asked if he had spent the night of July 21st in a hotel room in the Arlington area with Mr. Rock; he responded that he had (III-231). Dean described the black man who sold the lawn equipment to Mr. Rock as "about five-eight, about 28, 35 years old, two hundred pounds" (III-232). He admitted that he had been inside the restaurant part of the time and had not heard the entire conversation between the black man and Mr. Rock (III-233).

On re-direct, Mr. Dean testified that he spent the night in the hotel room with Mr. Rock that night because he had had a fight with his wife and they were separated. Mr. Rock paid for the room and there were two beds (III-234).

William Bolena, a detective for the Jacksonville Sheriff's Office, testified for the defense. He testified that he was asked by someone from the burglary unit to interview Mr. Rock. Bolena testified that, because Rock kept closing his eyes, he asked the detective if Rock was tired. Bolena stated that he was only there for a short period of time, and that Rock had looked tired to him (III-238-240).

The defense rested, motion for judgment of acquittal was renewed and denied (III-242).

14

## VI.  Findings of Fact and Conclusions of Law

### A.  Ground One

Petitioner asserts that the trial court erred in giving the following instruction to the jury:

> Now, ladies and gentlemen, if the defendant helped another person or persons commit or attempt to commit a crime, the defendant is then a principal and must be treated as if he had done all the things that the other person did if, one, the defendant had a conscious intent that the criminal act be done and, two, the defendant did some act or said some word which was intended to and which did incite or cause or encourage or assist or advise the other person or persons to actually commit or attempt to commit the crime.
>
> Now, to be a principal the defendant does not have to be present when the crime is committed or attempted.

Ex. C at 316.  Petitioner contends that this instruction may have misled the jury into finding him guilty based upon his possible involvement in the theft of the lawn equipment, an offense he was not charged with committing.

The Eleventh Circuit Court of Appeals has explained that a federal court's "limited role on habeas review, when faced with a challenge to a state law jury charge, is to determine whether any error or omission in the jury charge was so prejudicial as to amount to a violation of due process."  Agan v. Vaughn, 119 F.3d 1538, 1545 (11th Cir. 1997), cert. denied, 523 U.S. 1023 (1998)

15

(citing <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1055 (11th Cir. 1983)).

> A jury instruction that "was allegedly incorrect under state law is not a basis for habeas relief," <u>id</u>. at 71-72, 112 S.Ct. at 482, because federal habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." <u>Id</u>. at 68, 112 S.Ct. at 480. Unlike state appellate courts, federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, "'so infected the entire trial that the resulting conviction violate[d] due process.'" <u>Id</u>. at 72, 112 S.Ct. at 482 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)).

<u>Jamerson v. Secretary for the Dep't of Corrections</u>, 410 F.3d 682, 688 (11th Cir. 2005).

Here, there was evidence presented at trial that Petitioner aided and abetted another person in dealing in stolen property. Although several of Petitioner's inculpatory statements to the police interrogators contradicted each other, Detective Valentine testified that Petitioner first told him "[t]hat another person had stolen the items off of a truck, that he witnessed that person take the items" and "[t]hat he took those items and pawned them because he had identification and the other person didn't have identification." Ex. C at 175. Thus, the trial court did not err in giving the principal instruction since there was evidence

16

presented at trial that Petitioner aided and abetted this other person in dealing in stolen property.

Furthermore, there was overwhelming evidence that Petitioner actually dealt in stolen property. Petitioner told the police that he knew the items were stolen and that he had pawned the items. Additionally, his fingerprint was on the receipt from the pawnshop for the stolen items.  Thus, this Court concludes that the challenged instruction, viewed in the context of both the entire jury charge and the trial record, did not so infect the trial so that the resulting conviction violated due process.

Finally, Petitioner raised this claim on direct appeal, and the First District Court of Appeal per curiam affirmed the judgment of conviction.  Thus, this claim was rejected on the merits by the state appellate court.[5]  Clearly, the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Therefore, the Petitioner is not entitled to relief on the basis of this claim.

---

[5] As previously noted, for a state court's resolution of a claim to be an adjudication on the merits, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.  Wright, 278 F.3d at 1255.

## B. Ground Two

Petitioner claims that the trial court committed fundamental error in giving the following instruction to the jury:

> And finally, still under this category, proof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property was stolen.

Ex. C at 315.  He contends the instruction impermissibly led the jury to believe that the inference was mandatory rather than permissive, violating his right to due process of law by shifting the burden of proof from the prosecution to the defense.

The Court finds this claim to be without merit.  See Barnes v. United States, 412 U.S. 837, 841-46 (1973) (finding that where the evidence established that the defendant possessed recently stolen treasury checks payable to persons he did not know and there was no plausible explanation for such possession consistent with innocence, the traditional common-law inference arising from possession of recently stolen goods satisfied the reasonable doubt standard and comported with due process).

Even assuming the instruction shifted the burden of proof to the defense, that circumstance "does not automatically require reversal of an otherwise valid conviction; it is subject to the harmless error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)."  Collins v. Zant, 892 F.2d 1502, 1506 (11th Cir.), cert. denied, 498 U.S. 881 (1990).  Here,

18

the evidence showing that Petitioner knew the lawn equipment was
stolen was so overwhelming that the jury did not have to rely on
the allegedly erroneous instruction in convicting the Petitioner.
In all of his inculpatory statements to the police, which were
admitted into evidence at trial, the Petitioner either acknowledged
that he had personally stolen the items or that he had witnessed
the theft.  Thus, any error in giving this instruction was clearly
harmless.

Finally, Petitioner raised this claim on direct appeal, and
the First District Court of Appeal per curiam affirmed the judgment
of conviction.  Thus, this claim was rejected on the merits by the
state appellate court.  Clearly, the state court's adjudication of
this claim was not contrary to clearly established federal law, did
not involve an unreasonable application of clearly established
federal law, and was not based on an unreasonable determination of
the facts in light of the evidence presented in the state court
proceedings.  Therefore, the Petitioner is not entitled to relief
on the basis of this claim.

## C. Ground Three

Petitioner contends that the trial court erred in using a case
in which the prosecution had entered a nolle prosequi in
calculating his sentence under the guidelines.  This claim raises

19

an issue of state law that is not cognizable on federal habeas review.[6]

The purpose of a federal habeas proceeding is review of the lawfulness of Petitioner's custody to determine whether that custody is in violation of the Constitution or laws or treaties of the United States.  See Coleman v. Thompson, 501 U.S. 722, reh'g denied, 501 U.S. 1277 (1991).  The writ of habeas corpus under 28 U.S.C. § 2254 "was not enacted to enforce State-created rights." Cabberiza v. Moore, 217 F.3d 1329, 1333 (11th Cir. 2000) (citing Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988)), cert. denied, 531 U.S. 1170 (2001).

It is well established that federal courts cannot review a state's failure to adhere to its own sentencing procedures. Branan, 861 F.2d at 1508.  "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'"  Id.  (quoting Willeford v. Estelle, 538 F.2d 1194, 1198 (5th Cir. 1976)).

The federal habeas corpus court will be bound by the Florida court's interpretation of its own laws unless that interpretation

---

[6] In his Supplement Petition of Habeas Corpus (Doc. #14), Petitioner argues that his sentence was imposed in violation of the Sixth Amendment pursuant to the holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004).  Clearly, Petitioner has not exhausted any federal claim with respect to this ground and any federal claim is procedurally barred.  See Response at 30-34.

breaches a federal constitutional mandate.  McCoy v. Newsome, 953 F.2d 1252, 1264 (11th Cir.) (per curiam), cert. denied, 504 U.S. 944 (1992).  As succinctly stated by the Eleventh Circuit:

> A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.  Bronstein v. Wainwright, 646 F.2d 1048, 1050 (5th Cir. Unit B June 1981).   State courts are the ultimate expositors of their own state's laws, and federal courts entertaining petitions for writs of habeas corpus are bound by the construction placed on a state's criminal statutes by the courts of the state except in extreme cases.  Mendiola v. Estelle, 635 F.2d 487, 489 (5th Cir. Unit A 1981).

McCullough v. Singletary, 967 F.2d 530, 535-36 (11th Cir. 1992), cert. denied, 507 U.S. 975, reh'g denied, 507 U.S. 1046 (1993).

In sum, Petitioner's sentencing error claim under ground three presents an issue of state law that is not cognizable on federal habeas review.  Clearly, the Petitioner is not entitled to relief on the basis of this claim.

### D. Grounds Four and Five

In grounds four and five, Petitioner contends that he received ineffective assistance of appellate counsel.   In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court articulated a two-pronged test for determining whether a defendant was denied constitutionally adequate assistance of counsel.   "The same standard applies whether [a court is] examining the performance of counsel at the trial or appellate level."  Eagle v.

21

Linahan, 279 F.3d 926, 938 (11th Cir. 2001) (citing Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987)).

To demonstrate that his appellate counsel's performance was deficient, Petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687. "In considering the reasonableness of an attorney's decision not to raise a particular claim, [a court] must consider 'all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Eagle, 279 F.3d at 940 (quoting Strickland, 466 U.S. at 691). "Thus, '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time.'" Id. (quoting Strickland, 466 U.S. at 689). The reasonableness of counsel's assistance is reviewed in light of both the facts and law that existed at the time of the challenged conduct. Chateloin v. Singletary, 89 F.3d 749, 753 (11th Cir. 1996); see also Jones v. United States, 224 F.3d 1251, 1257-58 (11th Cir. 2000) (noting that counsel's "failure to divine" a change in unsettled law did not constitute ineffective assistance of appellate counsel) (quoting Sullivan v. Wainwright, 695 F.2d 1306, 1309 (11th Cir. 1983)).

To determine whether Petitioner was prejudiced by his attorney's failure to raise a particular issue, the Court "must

decide whether the arguments the [Petitioner] alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)), cert. denied, 531 U.S. 1131 (2001).  "If [a court] conclude[s] that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." Eagle, 279 F.3d at 943 (citing Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)).

In ground four, Petitioner contends that his appellate counsel was ineffective for failing to argue that the trial court was biased against Petitioner.  Petitioner alleges that the trial judge was impartial during a Nelson[7] hearing because the judge answered questions posed to counsel during that hearing.

Petitioner has completely failed to meet his burden under Strickland with respect to this claim because the judicial bias issue would not have been meritorious had appellate counsel raised it on direct appeal.   The Florida Supreme Court adopted the

_____

[7] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973) (holding that where a defendant, before the commencement of trial, requests discharge of his court-appointed counsel, the trial judge should make an inquiry of the defendant as to the reason for the request and, if incompetency of counsel is assigned as reason, should make a sufficient inquiry of the defendant and his appointed counsel to determine whether there is cause to believe that counsel is not rendering effective assistance to the defendant).

23

following procedure, announced in <u>Nelson</u>, for addressing a defendant's complaint that his appointed counsel is incompetent:

> If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute.

<u>Hardwick v. State</u>, 521 So.2d 1071, 1074-75 (Fla.) (quoting <u>Nelson</u>, 274 So.2d at 258-59), <u>cert</u>. <u>denied</u>, 488 U.S. 871 (1988).

From a review of the transcript of the <u>Nelson</u> hearing, it is clear that the judge conducted his inquiry in accordance with the holdings in <u>Nelson</u> and <u>Hardwick</u>. There is nothing in the transcript that demonstrates that the judge was biased against the Petitioner. Because this judicial bias issue was without merit, appellate counsel was not ineffective for failing to include this claim in Petitioner's direct appeal.

In ground five, Petitioner claims that his appellate counsel was ineffective for failing to argue that the prosecutor, in closing argument, violated the "Golden Rule." Petition at 9A.

24

Petitioner refers to the following portion of the prosecutor's closing argument:

> There's one other thing.  Defense counsel might get up here and tell you, well, you know those confessions to the two separate detectives, they weren't videotaped or they weren't audiotaped.  The detectives told you that it's not the policy of the Jacksonville Sheriff's Office, or their units, to videotape or audiotape interviews with persons or confessions.
>
> Now, if you disagree with that policy, when the trial is over with, you can call Sheriff Glover and tell Sheriff Glover we don't agree with that policy or I don't agree with that policy, I think you should tape record interviews, I think you should tape record confessions, but that's something you can do after the trial if you disagree with that policy.

Ex. C at 272-73.  At this point defense counsel objected, stating that, "It sounds like the Golden Rule to me."  Id. at 273.  The judge overruled the objection.  Id.  Thereafter, the prosecutor argued that the jurors should not let a guilty man walk free just because they might disagree with the policy of the Jacksonville Sheriff's Office.  Id.

Clearly, the prosecutor's argument did not violate the "golden rule."  The prosecutor did not ask the jurors to place themselves in the victim's position or ask them to imagine how they would feel if the victim were a relative.  Because this prosecutorial misconduct issue was without merit, appellate counsel was not

ineffective for failing to include this claim in Petitioner's direct appeal.

Even assuming arguendo that Petitioner could satisfy both prongs of the Strickland test for ineffective assistance of appellate counsel, the appropriate remedy would be for this Court to issue a writ of habeas corpus "conditioned upon Florida affording [Petitioner] a new direct appeal" with effective assistance of appellate counsel. Matire, 811 F.2d at 1439. Here, it is clear that the court with jurisdiction to hear this new direct appeal, the First District Court of Appeal, has considered and rejected Petitioner's claims.[8]

Thus, for all of the above-stated reasons, the Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.   The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.   The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

---

[8] As noted previously, Petitioner filed a petition for writ of habeas corpus with the First District Court of Appeal, in which he presented the same ineffective assistance of appellate counsel claims that he raises here. That court implicitly found the judicial bias and prosecutorial misconduct claims to be without merit by summarily denying the petition.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this ___/0__ day of

August, 2005.

_____
UNITED STATES DISTRICT JUDGE

ps 8/5
c:
Rudolph James Rock
Ass't Attorney General Bryan Jordan